IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

GOBIND SINGH, M.D., Ph.D.,    )
    )
    Plaintiff,    )
    )    NO. 3:17-cv-00400
v.    )
    )    JUDGE RICHARDSON
VANDERBILT UNIVERSITY    )
MEDICAL CENTER, et al.,    )
    )
    Defendants.

## MEMORANDUM OPINION

Before the Court is Defendants' Renewed Motion to Dismiss, or in the Alternative, Motion for Summary Judgment (Doc. No. 70). Plaintiff filed a response (Doc. No. 81), and Defendants replied (Doc. No. 83). For the reasons stated below, Defendants' motion will be denied.

**I. Renewed Motion to Dismiss**

On January 17, 2019, after reviewing the Magistrate Judge's Report and Recommendation, and Defendants' Objections thereto, the Court denied Defendants' motion to dismiss for lack of prosecution. *See Singh v. Vanderbilt Univ. Med. Ctr.*, No. 3:17-CV-00400, 2019 WL 254660, at *5 (M.D. Tenn. Jan. 17, 2019). The Court reasoned that "[a]lthough Defendants were prejudiced by the time and resources spent due to Plaintiff's delay, the Court finds it significant that Plaintiff did not act willfully, in bad faith, or with fault in his failure to timely comply with the Court's orders. Additionally, much of the prejudice to Defendants is alleviated with the continuance of the trial date." *Id.* at *5.

In addition to denying Defendants' motion to dismiss, the Court also found that Plaintiff had waived his attorney-client privilege as to communications with his former attorney in this

action, Tracey Kinslow, at least in part,[1] based on his inclusion of twenty-three separate communications with Mr. Kinslow, who represented Plaintiff at the time the communication was made, filed in support of his opposition to Defendants' motion to dismiss. Defendants thereafter subpoenaed all communications with Plaintiff from Mr. Kinslow, and the subpoena yielded several communications that Plaintiff had not provided to the Court in his previous filings. Specifically, Plaintiff left out an email to his former counsel wherein he stated that "[a]s a heads up, I sent some paperwork and requests to the courthouse after speaking with a few people that may or may not arrive in time, but *I am hoping the end goal of buying more time is achieved with it*." (Doc. No. 59 at ¶ 51) (emphasis added). Additionally, in a series of text messages the next day, Plaintiff again indicated that he was attempting to "buy[] time" with the Court because he felt overwhelmed. (*Id*.).

Defendants contend that these recently revealed communications undermine Plaintiff's position taken in his opposition to Defendants' motion to dismiss that he was essentially a victim of his then attorney's inept representation and that his lackluster participation in the discovery process was not his fault. Defendants contend that "[t]he only logical conclusion to be gleaned from this lack of attachment to Plaintiff's Declaration [*i.e.*, lack of prior filing by Plaintiff of the communications referred in the prior paragraph] is that Plaintiff did not want the Court to view these communications that might have potentially cause his intent to be seen in a different light" and "the Court should not reward this type of gamesmanship[.]" (Doc. No. 72 at 10-11). Therefore, Defendants renew their motion to dismiss for lack of prosecution and request that the Court dismiss this matter based on the prior non-disclosure of communications between Plaintiff and his then-attorney, Mr. Kinslow. (*Id*.).

---

[1] That is, "all communications with [Kinslow] regarding the subject matter of Plaintiff's prior disclosure, *i.e.*, discovery deadlines in this matter." *Singh*, 2019 WL 254660, at *5.

The revelation of these communications does not change the result reflected in the Court's prior Order. The Court does not agree with Defendants that the new communications completely undermine Plaintiff's position taken in his opposition to Defendants' motion to dismiss. Although Plaintiff did state in his email to Mr. Kinslow that he sent letters to the Court "to buy time," the context of the other communications (text messages) with Mr. Kinslow clearly demonstrate that relationship problems between Plaintiff and Mr. Kinslow existed at the time. In response to Mr. Kinslow's inquiry into Plaintiff's reasoning for sending his letter to the Court, Plaintiff responded:

> I'm sorry if you felt blind sighted [sic] that was not my intent by any means (and why I sent you email about this). I am feeling overwhelmed and pressure and I don't have clarity to many questions. Goal was to ask for more time to get help. I feel you might be overwhelmed too [Mr. Kinslow] for many reasons which is why I felt I needed to do something ASAP. . . . We are scrambling here for something important to me without Bryan, which isn't ideal.

(Doc. No. 70-5 at 50-53). The letter Plaintiff sent to the Court did indeed ask for more time to take his deposition. (Doc. No. 25). In the letter, Plaintiff also outlines the issues he had experienced with his former counsel, including Bryan Pieper, his initial counsel whose bar license was suspended in the midst of this lawsuit (Doc. No. 41), and his issue with Mr. Kinslow's non-responsiveness. The newly revealed communications highlight these issues and do not expose any dishonesty, or attempted "gamesmanship," in the Court's view. Plaintiff's (public) representations to the Court were not, in the Court's view, inconsistent with his (private) statement to his attorney that he sought to buy time; someone with the kind of problems disclosed by Plaintiff to the Court naturally might seek to buy time to cope with such problems.

Thus, upon review of all the communications, the Court stands by its prior finding that "Plaintiff did not act willfully, in bad faith, or with fault in his failure to timely comply with the Court's orders." *Singh*, 2019 WL 254660, at *5. The communications reviewed in totality reveal serious issues with his former counsel during the discovery process. Additionally, it is the Court's

strong preference to resolve lawsuits on the merits, rather than dismissals under Rule 45, except in the most extreme of circumstances. S*ee Beil v. Lakewood Eng'g and Mfg. Co.*, 15 F.3d 546, 552 (6th Cir. 1994) ("Dismissal is the sanction of last resort."); *see also Joseph Muller Corp. Zurich v. Societe Anonyme De Gerance Et D'Armement*, 508 F.2d 814, 825 (2d Cir. 1974) (explaining that dismissals for failure of the plaintiff to prosecute the action are largely a matter for the district court's discretion (citing *Link v. Wabash R. Co.*, 370 U.S. 626, 633 (1962))). Therefore, the Court will deny Defendants' Renewed Motion to Dismiss.

**II. Motion for Summary Judgment**

In the alternative, Defendants seek summary judgment on all of Plaintiff's remaining claims: Americans with Disabilities Act ("ADA") claim based on theories of failure to accommodate, discrimination, and retaliation; and state law claims of defamation and tortious interference with a business relationship.

**UNDISPUTED FACTS**[2]

On July 1, 2014, Plaintiff, Gobind Singh, M.D. ("Plaintiff"), began an Ophthalmology residency as a postgraduate year two resident ("PGY-2") at Vanderbilt University Medical Center ("VUMC"). (Doc. No. 94 at ¶ 1). At all times relevant hereto, Dr. Paul Sternberg served as the Chair of the Ophthalmology Program and Dr. Laura Wayman served as an Associate Professor, Vice Chair for Education, and Director of Resident Education. (*Id*.). Dr. Donald Brady served as the Senior Associate Dean for Graduate Medical Education in addition to the National Residency Match Program Designated Institutional Official for VUMC. (*Id*.).

---

[2] The following facts are deemed to be undisputed by the parties and gleaned from either Defendants' Response to Plaintiff's Statement of Undisputed Facts (Doc. No. 95) or Plaintiff's Response to Defendants' Statement of Undisputed Facts (Doc. No. 94).

In October 2014, Plaintiff began experiencing fatigue, trouble breathing, and trouble concentrating. (Doc. No. 95 at ¶ 12). On October 13, 2014, Plaintiff received a diagnosis of vestibular stenosis[3] and subsequently took medical leave to undergo nasal surgery on December 3, 2014. (Doc. No. 94 at ¶ 2). After the surgery, Plaintiff's symptoms did not improve and instead became worse. (*Id*.).

In December 2014, Plaintiff met with Dr. Wayman and Dr. Sternberg to discuss ongoing issues.[4] (Doc. No. 95 at ¶ 22). After this meeting, Dr. Wayman referred Plaintiff to VUMC's Faculty and Physician Wellness-Work Life Connections Employee Assistance Program ("EAP"), telling the EAP director that there were "deficits in the client's fund of knowledge, work ethic, and sense of responsibility." (Doc. No. 94 at ¶ 3; Doc. No. 95 at ¶ 23). Dr. Wayman informed Plaintiff that his attendance at the EAP sessions was mandatory. (Doc. No. 95 at ¶ 24). Plaintiff believed the purpose of the EAP referral was to accommodate his disabilities, and he reported his medical symptoms to the EAP doctor, Chad Buck, M.D. (*Id*. at ¶ 25). A January 28, 2015 email from Dr. Buck to Plaintiff explained that the impetus for the referral was performance issues, *i.e.*, that referral was "more about the need to improve [Plaintiff's] knowledge base than anything about interpersonal problems." (Doc. No. 94 at ¶ 3; Doc. No. 95 at ¶ 26).[5]

On March 24, 2015, Plaintiff was diagnosed with hypothyroidism. (Doc. No. 94 at ¶ 7). In April 2015, Plaintiff informed Dr. Wayman of his hypothyroidism diagnosis when he requested

---

[3] "Nasal vestibular stenosis is defined as a narrowing of the nasal inlet resulting in airway obstruction." Chang, Edward, *Auricular Composite Grafting to Repair Nasal Vestibular Stenosis*, 122(4) J. Otolaryngology Head Neck Surg. 529 (2000).

[4] A hotly-contested issue in this litigation, and one that is *very* material to Plaintiff's ADA claim, is what was discussed at this meeting, including, whether, as Plaintiff contends, he made a request for accommodations at this meeting.

[5] The specific knowledge of concern here apparently was professional knowledge, *i.e.*, knowledge applicable to the practice of medicine.

5

an accommodation to wear extra layers under his surgical attire to prevent his body and hands from shivering. (*Id*.). Dr. Wayman denied the requested accommodation because the extra layer of clothing would compromise the sterile field in the operating room. (*Id*.). Dr. Wayman allowed Plaintiff to wear additional clothing outside of the operating room. (*Id*.).

On May 26, 2015, Dr. Wayman informed Plaintiff that he (Plaintiff) was being placed on probation. (*Id*. at ¶ 4). As part of his probation, Plaintiff was required to attend scheduled meetings with Dr. Wayman and two other doctors in the Ophthalmology Department, which were slated to last until August 31, 2015. (*Id*.).

On June 15, 2015, Dr. Wayman informed Plaintiff that he was being placed on suspension based on an alleged patient interaction that occurred on June 8, 2015. (*Id*. at ¶ 5; Doc. No. 95 at ¶ 42). On June 22, 2015, Plaintiff informed Dr. Brady of his health issues. (Doc. No. 94 at ¶ 8). The next day, Dr. Brady sent Plaintiff an email stating, "Also, related to the medical issue that you disclosed to me yesterday, if you believe you need any accommodations to your residency program going forward, please contact the []Equal Opportunity, Affirmative Action, and Disability Services[] [("EAD")] office at 322-4705." (*Id*.). On June 24, 2015, Dr. Brady upheld Plaintiff's suspension, extended his probation, and either revoked his promotion, or decided to not promote him to PGY-3.[6] (Doc. No. 95 at ¶ 48).

On July 24, 2015, Plaintiff incorrectly administered an injection to a patient. (Doc. No. 95 at ¶ 49). On July 29, 2015, Dr. Wayman placed Plaintiff on a second suspension. (Doc. No. 94 at ¶ 6). Plaintiff never returned to work. (Doc. No. 94 at ¶ 12).

---

[6] Although not material, the parties dispute whether Plaintiff was promoted, but then had the promotion revoked, or instead was never promoted in the first place. (Doc. No. 94 at ¶ 1; Doc. No. 95 at ¶ 38).

On September 4, 2015, Plaintiff contacted VUMC's EAD, through his legal counsel at the time, Richard J. Braun, requesting a reasonable accommodation. Attorney Braun's email reads in relevant part:

> I have been retained to represent Dr. Singh, a resident in Ophthalmology who has experienced some medical issues which have impacted his performance and concentration and which have now created the potential for serious discipline. I will try to attach the letter from his treating physician or will fax it to Nancy soon. Pursuant to the Americans with Disabilities Act, we are requesting a reasonable accommodation that at such time as his physician certifies Dr. Singh is fit for duty that his shifts be limited to 12 hours in duration with 12 subsequent hours off duty until such time as he is fully recovered.
>
> We also request that any reference to potential discipline or performance issues be expunged from his record.
>
> Let me know if you have any questions.

(*Id*. at ¶ 9). On September 2, 2015, Plaintiff submitted a letter from Dr. Howard Baum regarding his diagnosis of hypothyroidism in March 2015 which stated, in part: "[i]n retrospect, in the months before his diagnosis, he may have suffered from decreased energy and decreased concentration which could have interfered with job performance." (*Id*. at ¶ 10). Additionally, Plaintiff submitted a letter from Dr. Scott Stephan dated September 3, 2015, indicating a diagnosis of vestibular stenosis with a corrective surgery on December 3, 2014. (*Id*.).

On September 11, 2015, Damian Marshall, a Specialist with VUMC's EAD office, sent an email to Plaintiff that explained the accommodation process and provided to Plaintiff a Request for Reasonable Accommodation Form. (*Id*. at ¶ 10). On September 21, 2015, Plaintiff submitted to the EAD office a Request for Reasonable Accommodation Form ("First Request Form") prepared by Dr. Baum. Dr. Baum indicated via the First Request Form that Plaintiff's condition had been resolved as of July 1, 2015, and that Plaintiff would need not accommodations "going forward." (*Id*. at ¶ 11). Defendants denied Plaintiff's request made in the First Request Form on

September 25, 2015, on the stated grounds that Dr. Baum did not indicate a need for accommodations going forward. (*Id.*).

On October 22, 2015, Plaintiff submitted another Request for Reasonable Accommodation Form ("the Second Request Form"). The Second Request Form, prepared by Dr. Susan Henley, requested several specific accommodations: 1) no "working without breaks for longer than 8 hours, could work an additional 4 hours after a 1 hour break"; 2) no working "longer than a 24 hour shift as long as appropriate breaks are given throughout one hour of rest for every six hours of work." (*Id.* at ¶ 11). Defendants denied the Second Request Form on the stated grounds that Plaintiff was suspended, and therefore not working at the time, and that thus there was no way to implement an accommodation. (Doc. No. 95 at ¶ 68). Three months later, on February 25, 2016, Defendants made a final decision to move to the Corrective Action of Immediate Dismissal. (Doc. No. 95 at ¶ 68). Dr. Wayman informed Plaintiff of his termination. (*Id.*). Plaintiff appealed the termination decision, but it was upheld after review through the appeal process. (*Id.*).

On April 21, 2016, Plaintiff applied for a new residency at New York Medical Center. (Doc. No. 95 at ¶ 74). As part of the hiring process, Dr. Brady sent to New York Medical Center a letter specifying the rotations Plaintiff completed, his disciplinary history, and the results of his June 2015 evaluations on which he had received low scores. (*Id.* at ¶ 75). The letter did not include any information about Plaintiff's accommodation requests or complaints to the EAD. (*Id.* at ¶ 76). After receiving the letter, New York Medical Center withdrew its offer to Plaintiff. (*Id.* at ¶ 80).

On March 1, 2017, Plaintiff filed his Complaint in this Court, asserting four claims against both Defendants:[7] an ADA claim based on theories of failure to accommodate, discrimination, and

---

[7] Defendants aver that "[e]ffective April 30, 2016, Vanderbilt University Medical Center, which had been part of The Vanderbilt University, became an independent legal entity. Plaintiff's lawsuit encompasses decisions during time periods before the separation of the two entities." (Doc. No. 71 at 1, n.1). Thus, the parties treat both Defendants the same for purposes of the analysis and the Court will do the same.

retaliation; a claim under Title VII of the Civil Rights Act of 1964 ("Title VII"); a state law claims of defamation; and a state law claim of tortious interference with a business relationship. (Doc. No. 1). On May 13, 2019, upon the parties' request, the Court dismissed Plaintiff's Title VII claim with prejudice. (Doc. No. 77). Defendants have moved for summary judgment as to the remaining federal (ADA) claim and the two state law claims.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). In other words, even if genuine, a factual dispute that is irrelevant or unnecessary under applicable law is of no value in defeating a motion for summary judgment. *See id.* at 248. On the other hand, "summary judgment will not lie if the dispute about a material fact is 'genuine[.]'" *Id.*

A fact is "material" within the meaning of Rule 56(c) "if its proof or disproof might affect the outcome of the suit under the governing substantive law." *Anderson*, 477 U.S. at 248. A genuine dispute of material fact exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Harris v. Klare*, 902 F.3d 630, 634-35 (6th Cir. 2018). The party bringing the summary judgment motion has the initial burden of identifying portions of the record that demonstrate the absence of a genuine dispute over material facts. *Pittman v. Experian Information Solutions, Inc.*, 901 F.3d 619, 627-28 (6th Cir. 2018). If the summary judgment

movant meets that burden, then in response the non-moving party must set forth specific facts showing that there is a genuine issue for trial. *Id*. at 628.

A party asserting that a fact cannot be or genuinely is disputed—i.e., a party seeking summary judgment and a party opposing summary judgment, respectively—must support the assertion by citing to materials in the record, including, but not limited to, depositions, documents, affidavits or declarations. Fed. R. Civ. P. 56(c)(1)(A). The court should view the facts and draw all reasonable inferences in favor of the non-moving party. *Pittman*, 901 F.3d at 628. Credibility judgments and weighing of evidence are improper. *Hostettler v. College of Wooster*, 895 F.3d 844, 852 (6th Cir. 2018). As noted above, where there is a genuine dispute as to any material fact, summary judgment is not appropriate. *Id*. The court determines whether sufficient evidence has been presented to make the issue of fact a proper jury question. *Id*. The mere existence of a scintilla of evidence in support of the nonmoving party's position will be insufficient to survive summary judgment; rather, there must be evidence upon which the jury could reasonably find for the nonmoving party. *Rodgers v. Banks*, 344 F.3d 587, 595 (6th Cir. 2003).

## ANALYSIS

1. **Americans with Disabilities Act**

*a. The Residency Program is Covered Activity*

As an initial matter, Defendants argue that the ADA does not apply to the conduct Plaintiff challenges. Specifically, Defendants assert that their actions were taken in the context of Plaintiff's residency training, which Defendants contend is more analogous to cases involving academic performance in educational settings than to cases involving activities in a purely employment context. (Doc. No. 72 at 11). Defendants assert that "[c]ourts have consistently held that assessing a student's academic performance must be left to the sound judgment of the individual academic

institution." (*Id.* (citing *Univ. of Penn. v. EEOC*, 110 S. Ct. 577, 587 (1990); *Regents of Univ. of Mich. v. Ewing*, 106 S. Ct. 507 (1985)). Therefore, Defendants posit, "[b]y analogy, Plaintiff's claim [] should be dismissed because the performance issues are training-related[.]" (*Id.*).

Numerous courts, including the Sixth Circuit, have evaluated medical residents' claims brought pursuant to the ADA without expressing any doubt that application of the ADA was appropriate. *See Jakubowski v. Christ Hosp., Inc.*, 627 F.3d 195, 203 (6th Cir. 2010); *see also Rodrigo v. Carle Found. Hosp.*, 879 F.3d 236, 242 (7th Cir. 2018) (considering a resident at a hospital an employee of the hospital for purposes of the ADA); *Diederich v. Providence Health & Servs.*, 622 F. App'x 613, 614 (9th Cir. 2015) (affirming the district court's denial of summary judgment as to the a medical resident's ADA claim); *Shin v. Univ. of Md. Med. Sys. Corp.*, 369 F. App'x 472, 473 (4th Cir. 2010) (analyzing ADA claim of medical intern against hospital); *Shaboon v. Duncan*, 252 F.3d 722, 737 (5th Cir. 2001) (affirming district court's holding that medical resident's ADA claim survived summary judgment). A medical resident's duties certainly center around training; however, medical residents serve a dual role: "they are simultaneously understood to be learners operating within the health care delivery system *and* to be paid *employees* of the program site." Regenbogen, Alexandra, *The Implications of the ADA Amendments Act of 2008 for Residency Training Program Administration*, 40 J. of the Am. Acad. of Psychiatry Law 40:553, 556 (Dec. 2012) (emphasis added).

Moreover, the Supreme Court has explained that medical residents are employees in the context of the Social Security system. In *Mayo Foundation for Medical Education & Research v. United States*, 562 U.S. 44 (2011), the Supreme Court rejected the hospital's argument that medical residents are not "fully trained" and thus have not begun their "working lives" because "these [resident] doctors—'who work long hours, serve as highly skilled professionals, and typically

share some or all of the terms of employment of career employees'—are the kind of workers that Congress intended to both contribute to and benefit from the Social Security system[.]" 562 U.S. at 60 (quoting 69 F. Reg. 8608). The Court discerns no reason why this same reasoning would not apply here. Accordingly, it is quite clear to the Court that medical residents are employees for purposes of the ADA and that Plaintiff, as an employee, may assert an ADA claim against his employer, Defendants. *See* 42 U.S.C. § 12111(4) (defining an "employee" as "an individual employed by an employer.").

b. *Failure to Accommodate*

The ADA specifically defines one aspect of discrimination under that Act to include not making reasonable accommodations to the known physical or mental limitations of an otherwise-qualified individual with a disability, unless the employer can demonstrate that the accommodation would impose an undue hardship on the operation of the business of that employer. *O'Donnell v. Univ. Hosps. Health Syst.*, No. 1:16-cv-2480, 2018 WL 1627436, at * 7 (N.D. Ohio Apr. 4, 2018) (citing 42 U.S.C. § 12112(b)(5)(A)).

To establish a *prima facie* case of failure to accommodate, plaintiff must show that: (1) he or she is disabled within the meaning of the ADA; (2) he or she is otherwise qualified for the position, with or without reasonable accommodation; (3) his or her employer knew or had reason to know about his disability; (4) he or she requested an accommodation; and (5) the employer failed to provide the necessary accommodation. *Keogh v. Concentra Health Servs., Inc.*, 752 F. App'x 316, 326 (6th Cir. 2018) (citing *DiCarlo v. Potter*, 358 F.3d 408, 419 (6th Cir. 2004)). In establishing this *prima facie* case, the plaintiff "bears the initial burden of proposing an

accommodation and showing that that accommodation is objectively reasonable." *Kleiber v. Honda of Am. Mfg.*, 485 F.3d 862, 870 (6th Cir. 2007).[8]

Defendants argue that Plaintiff cannot prove his *prima facie* case of failure to accommodate because (1) Plaintiff did not request an accommodation prior to September 2015, and Plaintiff's request for a retroactive accommodation is not cognizable; and (2) Defendants engaged in the interactive process to the extent required. For the reasons that follow, the Court finds that a genuine issue of material fact exists that precludes summary judgment on Plaintiff's failure-to-accommodate claim.

i. *There is a Genuine Dispute Whether Plaintiff Requested an Accommodation Prior to September 2015*

"When a disabled employee requires accommodation, the employee bears the burden to propose a reasonable accommodation." *Arndt v. Ford Motor Co.*, 716 F. App'x 519, 527 (6th Cir. 2017) (citing *Jakubowski*, 627 F.3d at 202-03). The Sixth Circuit has explained that it has not established a "bright-line test for when the form of an employee's request is sufficiently clear to constitute a request for an accommodation." *Deister v. Auto Club Ins. Ass'n*, 647 F. App'x 652, 657–58 (6th Cir. 2016) (quoting *Judge v. Landscape Forms, Inc.*, 592 F. App'x 403, 407 (6th Cir. 2014)). "Although a plaintiff need not use the word 'accommodate' or 'disability,' at a minimum he must 'make it clear from the context that [the request] is being made in order to conform with existing medical restrictions.'" *Id.* (quoting *Leeds v. Potter*, 249 F. App'x 442, 449 (6th Cir. 2007)); *see also Colwell v. Rite Aid Corp.*, 602 F.3d 495, 506-07 (3d Cir. 2010) ("Indeed, '[t]he

---

[8] The burden-shifting framework set forth in *McDonnell Douglas* does not apply to a failure-to-accommodate theory. *Brumley v. United Parcel Serv., Inc.*, 909 F.3d 834, 839 (6th Cir. 2018). This is "[b]ecause 'not making reasonable accommodations' is listed in the ADA's definition of disability discrimination, see 42 U.S.C. S 12112)b)(5)(A), 'claims premised upon an employer's failure to offer a reasonable accommodation necessarily involve direct evidence (the failure to accommodate) of discrimination." *Morrissey v. Laurel Health Care Co.*, No. 18-1704, 2019 WL 6486841, at *3 (6th Cir. Dec. 3, 2019) (citing *Kleiber*, 485 F.3d at 868).

law does not require any formal mechanism or magic words to notify an employer that an employee needs an accommodation and circumstances will sometimes require the employer to meet the employee half-way. . . .'" (quoting *Conneen v. MBNA Am. Bank, N.A.*, 334 F.3d 318, 332 (3d Cir. 2003))); *Talley v. Family Dollar Stores of Ohio, Inc.*, 542 F.3d 1099, 1109 (6th Cir. 2008) (indicating a reasonable accommodation request could be made in either written or oral form); *Smith v. Henderson*, 376 F. 3d 529, 535–36 (6th Cir. 2004) (holding that the plaintiff's letter asking to delegate the plaintiff's duties along with the employer's previous knowledge of disability, could support the inference that the letter made a "request for accommodation").

Defendants argue that Plaintiff's generalized complaint of being tired or fatigued does not trigger Defendants' duty to engage in an interactive process or provide reasonable accommodation. (Doc. No. 72 at 18-19 (citing *Kobus v. College of St. Scholastica Inc.*, No. 07-3881, 2009 WL 294370, at *8 (D. Minn. Feb. 5, 2009) ("Kobus's general complaint about stress and anxiety—even with his mention of mild accompanying physical symptoms—were insufficient to provide St. Scholastic with notice that he had a qualifying disability under the ADA.")). According to Defendants, Plaintiff did not make a request for an accommodation until September 2015, when his attorney sent an email to the EAD. (*Id*.). Thus, according to Defendants, Plaintiff "sought an accommodation *only after* he had been suspended twice and placed on probation." (*Id*.). Defendants contend that "[t]he law is clear that a request for a reasonable accommodation is forward looking and prospective; thus, an employee is not entitled to a retroactive accommodation." (*Id*. (citation omitted)).

Plaintiff responds that Defendants "ignore[] Plaintiff's own testimony of asking for the accommodations early and often." (Doc. No. 81 at 21). In Plaintiff's deposition, he testified that in a December 2014 meeting with Dr. Wayman and Dr. Sternberg, he "requested breaks when long

shifts, requested less time on call, requested having not 26-hour shifts, and specifically more time to pursue [his] medical work-up" (Doc. No. 80-2 at 16). He also testified that he requested accommodations on specific occurrences in April, June, and July 2015. (*Id.* (citing Doc. No. 80-2 at 49-52, 58-59, 174)). Defendants dispute that these accommodation requests were made. *See* (Doc. No. 80-1 at 9 (Dr. Wayman testified that she did not recall Plaintiff ever making an accommodation request); (Doc. No. 80-3 at 3 (Dr. Brady testified that Plaintiff never asked for an accommodation); (Doc. No. 80-4 at 7) (Dr. Stegman testified that Plaintiff never discussed needing breaks during the day, or a decrease in his scheduled hours)). At the summary judgment stage, credibility judgments and weighing of evidence are improper, and the facts must be viewed most favorably for the non-movant (here, Plaintiff). *Hostettler*, 895 F.3d at 852. With this in mind, the Court concludes that a reasonable juror could find that Plaintiff requested an accommodation as early as December 2014.[9]

---

[9] As noted above, Plaintiff "bears the initial burden of proposing an accommodation *and* showing that that accommodation is objectively reasonable." *Kleiber*, 485 F.3d at 870 (emphasis added). Defendants do not appear to contest that Plaintiff's request for a modification of scheduled work hours is an objectively reasonable accommodation. In any event, the Court notes that the ADA's statutory definition of reasonable accommodation specifically includes "modified work schedules." 42 U.S.C. § 12111(9)(b).

*ii. There is a Genuine Issue of Fact Whether Defendants Failed to Engage in an Interactive Process*[10]

Under the ADA, when an employee proposes a reasonable accommodation, "the employer has a duty to engage in an 'interactive process' to 'identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations.'" *Melange v. City of Ctr. Line*, 482 F. App'x 81, 84-85 (6th Cir. 2012) (quoting *Kleiber*, 485 F.3d at 871); *see also* 29 C.F.R. § 1630.2(o)(3).

To show that his or her employer failed to participate in the interactive process, a plaintiff with a disability must demonstrate:

> 1) the employer knew about the employee's disability; 2) the employee requested accommodations or assistance for his or her disability; 3) the employer did not make a good faith effort to assist the employee in seeking accommodations; and 4) the employee could have been reasonably accommodated but for the employer's lack of good faith . . . .

*Clark v. Whirlpool Corp.*, 109 F. App'x 750, 755 (6th Cir. 2004) (quoting *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 319–20 (3d Cir. 1999)). "When a party obstructs the process or otherwise

---

[10] There appears to be confusion among courts as to whether failure-to-accommodate claims and failure-to-engage-in-the-interactive-process claims are independent causes of action, or whether failure to engage in the interactive process is merely a theory that supports a claim for failure to accommodate. Instead, "[m]ost courts hold that an employer's failure to engage in the interactive process is not an independent legal violation." Barbara T. Lindemann & Paul Grossman, *Employment Discrimination Law* 922 (C. Geoffrey Weirich ed., 4th ed. 2007); *see also Matos v. DeVos*, 317 F. Supp. 3d 489, 497 (D.C.C. 2018) ("There is no independent cause of action for failure to engage in the interactive process—under the ADA . . . there is only a cause of action for failure to accommodate generally."); *Whelan v. Teledyne Metalworking Prods.*, 226 F. App'x 141, 147 (3d 2007) (indicating that a failure to engage in the interactive process claim is not an independent cause of action); *Ozlowski v. Henderson*, 237 F.3d 837, 840 (7th Cir. 2001) ("[T]he failure to engage in the interactive process by itself does not give rise to relief."); *Fjellestad v. Pizza Hut of Am., Inc.*, 188 F.3d 944, 952 (8th Cir. 1999) ("[T]here is no *per se* liability under the ADA if an employer fails to engage in an interactive process."). Although the Sixth Circuit has not clearly stated that an alleged failure to engage in the interactive process is not a standalone claim, in *Kleiber*, the court analyzed a failure-to-engage-in-the-interactive-process argument as if it were a part of a failure-to-accommodate claim. *See* 485 F.3d at 871. And district courts within the Sixth Circuit have followed suit. *See Doe v. Directions for Youth & Families, Inc.*, No. 15-cv-2861, 2016 WL 6093370, at *8 (S.D. Ohio Oct. 19, 2016) (specifically coining the term "accommodation claim," to refer to the plaintiff's claim that the defendant failed to engage with the plaintiff in an interactive process seeking a reasonable accommodation for her disability). Additionally, Plaintiff agrees that his failure to engage in the interactive process claim is a "type" of a failure to accommodate claim. (*See* Doc. No. 81 at 20 ("Failing to engage in the interactive process regarding accommodations is a type of failure to accommodate." (citing *Kleiber*, 485 F.3d at 871))). Thus, the Court will proceed accordingly.

fails to participate in good faith, courts should attempt to isolate the cause of the breakdown and then assign responsibility." *Kleiber*, 485 F.3d at 871 (internal quotation marks and citation omitted). "An employer has sufficiently acted in good faith when it readily meets with the employee, discusses any reasonable accommodations, and suggests other possible positions for the plaintiff." *Jakubowski*, 627 F.3d at 203. "Failing to discuss a reasonable accommodation in a meeting in which the employer takes an adverse employment action against an injured employee may demonstrate a lack of good faith." *Rorrer v. City of Stow*, 743 F.3d 1025, 1040 (6th Cir. 2014) (citation omitted).

Defendants argue "[a]ssuming that the Court finds that Plaintiff actually requested an accommodation sufficient to trigger the beginning of the interactive process prior to September 2015, [Defendants] contend[] that the process in which it engaged with Plaintiff was sufficient under the law." (Doc. No. 72 at 19). According to Defendants:

> [T]he evidence irrefutably establishes that prior to September 2015, Defendants provided Plaintiff with: 1) leave to have and recover from surgery for vestibular stenosis in December 2014; 2) referred Plaintiff to its EAP Program in December 2014 with Plaintiff; and 3) specifically referred Plaintiff to its EAD Program (via Dr. Brady) on June 23, 2015.

(*Id.*). Defendants contend that these actions establish that Dr. Brady and Dr. Wayman engaged in the interactive process and that a reasonable juror could not conclude otherwise.

The Court disagrees with Defendants because several facts of record could allow a reasonable juror to conclude that Defendants failed to adequately work with Plaintiff to identify whether some accommodation could be arranged to permit Plaintiff to continue to work. Although Dr. Wayman did grant Plaintiff's request for time off to have sinus surgery, according to Plaintiff she did not entertain his "request for modifications of [his] schedule" upon his return to work after surgery. Further, she did not refer him to the EAD at any time, in fact, Dr. Wayman testified that

prior to her deposition, she was not aware that an EAD reasonable accommodation request form existed, and she had never seen the form during her tenure at Vanderbilt. (Doc. No. 80-1 at 9). Additionally, although Dr. Wayman did refer Plaintiff to an EAP program, Dr. Buck, the EAP doctor, informed Plaintiff that his referral was made with respect to his *performance* issues, not medical issues, and the EAP records reflect that Dr. Wayman's referral of Plaintiff to the EAP was based on "deficits in [Plaintiff's] fund of knowledge, work ethic, and sense of responsibility." (Doc. No. 95 at ¶¶ 23-26).

Unlike Dr. Wayman, Dr. Brady did refer Plaintiff to the EAD. But he did so only conditionally, and not without reservations. Specifically, on June 23, 2015—the same day Dr. Brady met with Plaintiff and extended Plaintiff's suspension (Doc. No. 80-11 at 3)—Dr. Brady stated in an email to Plaintiff, "Also, related to the medical issue that you disclosed to me yesterday, if you believe you need any accommodations to your residency program going forward, please contact the EAD[.]" (Doc. No. 70-5 at 33). The Sixth Circuit has explained that failing to "discuss a reasonable accommodation in a meeting in which the employer takes an adverse employment action against an injured employee may demonstrate a lack of good faith [in engaging in the interactive process]." *Rorrer*, 743 F.3d at 1040 (6th Cir. 2014). A reasonable jury could find that Dr. Brady's referral, done on the same day as the meeting in which he decided to extend Plaintiff's suspension and not promote him to PGY-3, demonstrates a lack of good faith in engaging in the interactive process as mandated by the ADA.

Further, Dr. Brady's referral was *months* after Plaintiff maintains he made his first request for accommodations to Dr. Wayman in December 2014. A reasonable juror could find this delay in taking action on Plaintiff's December 2014 request to be unreasonable. *See Gerton v. Verizon South Inc.*, 145 F. App'x 159, 169 (6th Cir. 2005) (explaining that an employee must produce

evidence demonstrating that any "delay in [responding to] her request for accommodation was unreasonable."). Accordingly, viewing the facts in the light most favorable to Plaintiff, a reasonable juror could find that Defendants failed to engage in the interactive-process as mandated by the ADA. Therefore, Plaintiff's interactive process claim will proceed to trial.

### b. Discriminatory Discharge

The ADA makes it unlawful for an employer to discriminate against an employee "on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge [of employment.]" 42 U.S.C. § 12112(a). To prevail on such a claim, a plaintiff must show he or she (1) is disabled, (2) is otherwise qualified to perform the essential functions of the position, with or without accommodation, and (3) suffered an adverse employment action because of his or her disability. *Ferrari*, 826 F.3d at 891. To succeed at the summary judgment stage, the movant (here, Defendants) "bears the initial burden of showing the absence of a genuine dispute of material fact as to at least one essential element of the non-movant's [(Plaintiff's)] claim." *Celotex Corp.*, 477 U.S. at 323.

Defendants first take aim at the second essential element, attempting to show that Plaintiff cannot possibly establish that he was qualified for the position given his alleged performance deficiencies. Plaintiff maintains that if he had been granted accommodations, *i.e.*, more breaks and shorter hours, he would have not had the performance issues that Defendants aver led to their decision to terminate Plaintiff. (Doc. No. 94 at ¶ 9). Plaintiff's position has merit. The Sixth Circuit has held that an employer cannot escape liability by blaming inadequate performance issues if the employer failed to accommodate the employee.

> [A] company may not illegitimately deny an employee a reasonable accommodation to a general policy and use that same policy as a neutral basis for firing him. Imagine a school that lacked an elevator to accommodate a teacher with mobility problems. It could not refuse to assign him to classrooms on the first floor,

then turn around and fire him for being late to class after he took too long to climb the stairs between periods.

*Equal Employment Opportunity Commission v. Dolgencorp, LLC*, 899 F.3d 428 (6th Cir. 2018); *see Morrissey v. Laurel Health Care Co*., No. 18-1704, 2019 WL 7043167, at *8 (6th Cir. Dec. 23, 2019) ("Coldwater cannot refuse to provide Morrissey with a reasonable accommodation and then conclude that she is not qualified for her position because she cannot meet her job's requirements without an accommodation."); *McPherson v. Mich. High Sch. Athletic Ass'n, Inc.*, 119 F.3d 453, 460 (6th Cir. 1997) (en banc) ("failure to consider the possibility of reasonable accommodation for known disabilities, if it leads to discharge for performance inadequacies resulting from the disabilities, amounts to a discharge solely because of the disabilities."); *Gilday v. Mecosta Cty*., 124 F.3d 760, 766 (6th Cir. 1997). It is undisputed that Defendants did not grant Plaintiff an accommodation at any time;[11] therefore, Defendants cannot rely on any purported deficiencies in Plaintiff's performance to show the absence of a genuine dispute of material fact as this element of Plaintiff's claim.

Defendants' second argument, that Plaintiff has not shown evidence of a similarly situated comparator, likewise misses the mark, though for a different reason. Specifically, this argument is simply inapplicable because a Plaintiff need make such a showing only when there is no direct evidence of discrimination. *Dolgencorp, LLC*, 899 F.3d at 436 ("The company maintains that the plaintiffs failed to demonstrate that similarly situated non-protected employees were treated more favorably than [the employee]. But this showing is necessary only when there is no direct evidence of discrimination." (citing *Hopkins v. Elec. Data Sys. Corp.*, 196 F.3d 655, 660 (6th Cir. 1999))). The Sixth Circuit has explained that "failing to provide a protected employee a reasonable

---

[11] However, the Court reiterates that it *is* disputed whether Plaintiff sufficiently requested an accommodation in the first place, prior to any adverse action being taken. This question is one for the jury to resolve at trial.

accommodation constitutes direct evidence of discrimination." *Id.* Accordingly, Defendants have failed to demonstrate the lack of a genuine issue of material fact as to the elements of Plaintiff's discriminatory discharge claim; thus, this claim will proceed to trial.

### c. Retaliation

ADA retaliation claims based on indirect evidence of retaliation are analyzed using the burden-shifting approach established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).[12] *Rorrer*, 743 F.3d at 1046 (citing *A.C. v. Shelby Cnty. Bd. of Educ.*, 711 F.3d 687, 697 (6th Cir. 2013)). Under this approach, the initial burden is on the plaintiff at trial to make out a *prima facie* case of discrimination by demonstrating that (1) the plaintiff engaged in activity protected under the ADA;[13] (2) the employer knew of that activity; (3) the employer took an adverse action against plaintiff; and (4) there was a causal connection between the protected activity and the adverse action. *Rorrer*, 743 F.3d at 1046. The plaintiff must show "but for" causation. *Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312, 321 (6th Cir. 2012) (en banc).

At the *prima facie* stage, the plaintiff's burden is minimal as to the fourth element, requiring merely that the plaintiff "put forth some evidence to deduce a causal connection between the retaliatory action and the protected activity." *Nguyen v. City of Cleveland*, 229 F.3d 559, 566 (6th Cir. 2000). This evidence must be sufficient to allow "an inference . . . that the adverse action would not have been taken had the plaintiff" not engaged in protected activity. *Id.* at 563.

If the plaintiff establishes a *prima facie* case of discrimination under the ADA, then the burden shifts the defendant to offer a legitimate, nondiscriminatory reason for the adverse

---

[12] Plaintiff's retaliation claim plainly is based on indirect evidence; he has not proffered direct evidence of retaliation, and he discusses the *McDonnell Douglas* burden-shifting scheme in his response to Defendants' argument regarding his retaliation claim. (Doc. No. 81 at 28-30).

[13] The Sixth Circuit has held that a request for accommodation is a protected act under the ADA. *See A.C. ex rel. J.C.*, 711 F.3d at 698.

employment action. *Talley*, 542 F.3d at 1105. If the defendant makes that proffer, then the burden shifts back to the plaintiff to show by a preponderance of the evidence that the defendant's proffered reason is merely a pretext for discrimination. *Id.*

Although the initial burden rests with Plaintiff at trial, on summary judgment Defendants have the initial burden of identifying portions of the record that demonstrate the absence of a genuine dispute of material facts. *Pittman*, 901 F.3d at 627-28. In their argument regarding Plaintiff's retaliation claim, which is less than one page long, Defendants assert that Plaintiff has not shown evidence of a causal connection between Plaintiff's protected activity and Plaintiff's termination. But merely asserting that a non-movant plaintiff has not adduced evidence on a material issue, without first pointing to specific record evidence that demonstrates the absence of evidence on that issue, does not suffice for a defendant-movant to meet its initial burden at summary judgment on that issue.

To the extent Defendants do anything to attempt to meet their initial burden, they imply that there is no genuine dispute of fact regarding causal connection because (according to Defendants) a reasonable juror could not find a causal connection between Plaintiff's protected activity and Plaintiff's termination given that "Plaintiff's complaints of discrimination occurred *well after* the performance issues that led to his dismissal." (Doc. No. 72 at 15). However, from the (undisputed) quoted fact, a juror could reasonably infer that it was Plaintiff's protected activity (in filing two requests for reasonable accommodation forms with the EAD less than three months prior to his termination) that finally prompted the Defendants to terminate Plaintiff, rather than his performance issues that occurred approximately seven months before his termination.[14] Thus,

---

[14] Plaintiff's last documented error was in July 2015 and he was terminated in February 2016.

Defendants' argument merely highlights the fact that Plaintiff's termination is temporally associated far more closely with his complaints of discrimination than with his performance issues.

Accordingly, Defendants have failed to meet their initial burden at summary judgment and demonstrate the absence of a genuine dispute of material fact as to the causation element of Plaintiff's retaliation claim.[15] This claim will proceed to trial.

### 2. Defamation

Plaintiff asserts that Defendants defamed him when they submitted the Summary Evaluation to NYMC that "contained multiples false, defaming, and misleading statements regarding Plaintiff and his qualifications to be a resident and medical doctor." (Doc. No. 81 at 34). To establish a claim for defamation under Tennessee law, "Plaintiff must prove that (1) a party published a statement; (2) with knowledge that the statement was false and defaming to the other; or (3) with reckless disregard for the truth of the statement or with negligence in failing to ascertain the truth of the statement." *Shamblin v. Martinez*, No. M2010–00974–COA–R3–CV, 2011 WL 1420896, at *3 (Tenn. Ct. App. April 13, 2011). Only false statements are actionable, and truth is a nearly universal defense. *West v. Media Gen. Convergence, Inc.*, 53 S.W.3d 640, 645 (Tenn. 2001) (citations omitted). However, "[i]t is no defense whatever that individual statements within the article were literally true. Truth is available as an absolute defense only when the defamatory meaning conveyed by the words is true." *Memphis Publ'g Co. v. Nichols Memphis Publ'g*, 569 S.W.2d 412, 420 (Tenn. 1978).

Defendants argue that Plaintiff did not produce evidence that Defendants published any statement with knowledge that such statement was false, because all the statements published to

---

[15] The Court emphasizes that causation as to retaliation claims ordinarily is a jury question. *Head v. Town of Gainesboro, Tenn.*, No. 2:11-cv-92, 2013 WL 4780080, at *4 (M.D. Tenn. Sept. 5, 2013). Additionally, the bar for demonstrating the plaintiff's prima facie case is a low one. *M.L. v. Williamson Cty. Bd. of Educ.*, No. 3:16-cv-1093, 2018 WL 2970704, at *3 (M.D. Tenn. June 12, 2018).

New York Medical Center were true. (Doc. No. 72 at 21). In response, Plaintiff argues that while the statements Defendants provided to New York Medical Center may not have been false, "[d]efamation, in Tennessee involves 'defamation by implication,' where statements are *literally true* but still convey a false impression." (Doc. No. 81 at 33). Plaintiff asserts that "defendants spoke with a reckless disregard for the truth when they failed to provide context to the performance issues Plaintiff did have" when Defendants "left out all information about Plaintiff's positive achievements as well as his disabilities, requests for accommodation, and other mitigating factors that explain the alleged performance deficiencies."(*Id*. (citing Doc. No. 70-5 at 48)).

Defamation by implication occurs when statements that are true are nevertheless actionable because they imply facts that are not true. *Aegis Scis. Corp. v. Zelenik*, No. M2012–00898–COA–R3–CV, 2013 WL 175807, at *11 (Tenn. Ct. App. Jan. 16, 2013). The Tennessee Court of Appeals recently explained:

> [t]o prevail on [a] defamation by implication or innuendo claim, [the plaintiff] must establish [] that [the defendant] published the statements and that the meaning reasonably conveyed by the statements was defamatory. *Nichols*, 569 S.W.2d at 420 . . . . [I]f the statements at issue are true but they imply facts that are not true, a defendant who made the statements may be liable for defamation by implication or innuendo. *Grant [v. Commercial Appeal*, No. W2015–00208–COA–R3–CV, 2015 WL 5772524, at *12 (Tenn. Ct. App. Sept. 18, 2015]).

*Loftis v. Rayburn*, No. M2017-01502-COA-R3-CV, 2018 WL 1895842, at *5 (Tenn. Ct. App. Feb. 5, 2018). The Sixth Circuit has explained that under Tennessee law, "[t]he question of whether [a writing] was understood by its readers as defamatory is a question for the jury, but the preliminary determination of whether the [writing] is 'capable of being so understood is a question of law to be determined by the court.'" *Seaton v. TripAdvisor LLC*, 728 F.3d 592, 597 (6th Cir. 2013) (quoting *McWhorter v. Barre*, 132 S.W.3d 354, 364 (Tenn. Ct. App. 2003)).

In *Memphis Publishing Co. v. Nichols*, 569 S.W.2d 412 (Tenn. 1978), the plaintiff sued the defendant, a newspaper, when the newspaper ran a story about a wife who shot her husband and another woman (the plaintiff) after the wife found her husband at the other woman's house. 569 S.W.2d at 414. The plaintiff brought a defamation claim against the defendant, asserting that the defendant falsely implied that she was having an affair and the wife caught them together when she fired the shots. *Id*. The undisputed evidence showed, however, that several people were at the plaintiff's house when the assailant found her husband, and they were all sitting around the living room talking. *Id*. Nevertheless, the court reasoned that the truth of the statements did not relieve the newspaper of liability if "the meaning reasonably conveyed by the published words is defamatory." *Id*. at 420. The Court explained that "[t]he published statement . . . so distorted the truth as to make the entire article false and defamatory." *Id*.

Here, like the contents of the article in *Nichols*, it is undisputed that the information detailing Plaintiff's experience as a medical resident at Vanderbilt that Dr. Brady published to New York Medical Center was literally true. But this reality does not get Defendants far enough to prevail on motion for summary judgment, due to the very broad scope of liability under a Tennessee defamation-by-implication theory. It is undisputed that the letter did not include information regarding Plaintiff's medical conditions or any of his positive performance reviews. (Doc. No. 95 at ¶ 78). Tellingly, after reviewing the letter and discussing its contents with Plaintiff, three NYMC doctors sent the NYMC residency program director, Dr. Bierman, a letter stating that the evaluation received "from Vanderbilt University regarding [Plaintiff's] performance as a Resident lists disciplinary actions taken and his ultimate dismissal *in a fashion that offers no explanations for his poor performance*. After many hours of discussion with [Plaintiff], an, [sic] credible, documented, alternative cause of his poor performance became clear." (Doc. No. 70-5)

(emphasis added). The Court finds that this evidence viewed in the light most favorable to Plaintiff could lead a reasonable juror could find that the letter was "reasonably capable of being understood in a defamatory sense[.]" *Nichols*, 569 S.W.2d at 419; *see also Aegis Scis. Corp.*, 2013 WL 175807, at *11. Therefore, the "ultimate question of whether [the letter] was understood by its intended audience to be defamatory is one for the jury." *Id.*[16] Plaintiff's defamation claim will proceed to trial.

### 3. Tortious Interference with a Business Relationship

Plaintiff asserts that Defendants tortuously interfered with his business relationship with New York Medical Center. To survive summary judgment, Plaintiff must adduce evidence of the following elements:

> (1) an existing business relationship with specific third parties or a prospective relationship with an identifiable class of third persons; (2) the defendant's knowledge of that relationship and not a mere awareness of the plaintiff's business dealings with others in general; (3) the defendant's intent to cause the breach or termination of the business relationship; (4) the defendant's improper motive or improper means, . . . and finally, (5) damages resulting from the tortious interference.

*Trau-Med of America, Inc. v. Allstate Ins. Co.*, 71 S.W.3d 691, 701 (Tenn. 2002) (internal citation omitted). The *entirety* of Defendants' argument in their memorandum of law, after listing the elements of a tortious interference with a business relationship claim under Tennessee law, is as

---

[16] Defendants argue that they cannot be liable for any actions regarding the communications with NYMC for the additional reason that Plaintiff signed a Release that allowed Defendants to submit information to NYMC. (Doc. No. 72 at 20). However, the Release applies only to Defendants' *good faith* disclosures. (*Id.*). Specifically, the Release states "I hereby release from liability hold harmless [Defendants] . . . for their actions performed in good faith and without malice in connection with providing information." (Doc. No. 70-4 at 1). Tennessee courts apparently have not specifically coined an authoritative definition of "good faith." But in *Arnold v. City of Chattanooga*, 19 S.W.3d 779 (Tenn. Ct. App. 1999), the Tennessee Court of Appeals explained that bad faith is "[t]he opposite of 'good faith,' generally implying or involving actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive." Viewing the facts in a light most favorable to Plaintiff, a jury could determine that Defendants, by disclosing only negative information regarding Plaintiff's residency performance did not act in good faith. Accordingly, the Release will not prevent Plaintiff's state law claims from surviving summary judgment.

follows: "Plaintiff has not provided any proof on two essential elements of an intentional interference with a business relationship claim—intent to cause the breach and improper motive or means. Consequently, this claim should be dismissed. (Doc. No. 72 at 21 (citing *Overnite Transp. Co. v. Teamsters Local Union No. 480*, No. M2002-02116-COA-R3CV, 2004 WL 383313, at *13 (Tenn. Ct. App. Feb. 27, 2004), aff'd, 172 S.W.3d 507 (Tenn. 2005)).

As Plaintiff aptly points out in his response, Defendants' underdeveloped argument does not meet their burden on summary. (Doc. No. 81 at 35). At summary judgment, Defendants must "*by reference to materials on file* [show] that there are no genuine issues of material fact that should be decided at trial." *Clark v. Coates & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991) (emphasis added). Where, as here, the defendant-movant fails to do so and thereby does not meet is initial burden, the burden never shifts to the plaintiff to adduce any proof. *Id*. The Sixth Circuit has repeatedly explained that "[i]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in [a] skeletal way, leaving the court to put flesh on its bones." *United States v. Fowler*, 819 F.3d 298, 309 (6th Cir. 2016) (second alteration in original) (quoting *El-Moussa v. Holder*, 569 F.3d 250, 257 (6th Cir. 2009)); *see also United States v. Zannino*, 895 F.2d 1, 8 (1st Cir. 1990) ("It is not enough to merely mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones."). Additionally, the Court does not find Defendants' citation to *Overnite Transportation* particularly helpful, because that case involves a motion to dismiss and the plaintiff's failure to *plead* intent, as opposed to a summary judgment motion where the defendant-movant never discharged its initial burden to show the absence of a genuine issue as to intent. *See Overnite Transp*., 2004 WL 383313, at *13

In their Reply, Defendants assert for the first time that this claim should be dismissed because an audio recording (of a conversation between Defendants and Dr. Wandel of NYMC) that Plaintiff relies on to support his claim is inadmissible hearsay and therefore, Plaintiff has not proffered evidence of his tortious interference claim.

The Court declines to consider Defendants' arguments raised for the first time in their Reply. *Xiaoguang Zheng v. Soufun Holdings Ltd.*, No. 16-3940, 2017 WL 3708628, at *2 (6th Cir. May 18, 2017) ("[W]e decline to consider the arguments that the plaintiffs raise for the first time in their reply brief." (citing *Anton v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 634 F.3d 364, 368 n.2 (6th Cir. 2011); *Priddy v. Edelman*, 883 F.2d 438, 446 (6th Cir. 1989))); *see also G.C. ex rel. Johnson v. Wyndham Hotels & Resorts, LLC*, 829 F. Supp. 2d 609, 614 (M.D. Tenn. 2011) (explaining that arguments raised for the first time in reply briefs "are generally not considered because such a practice deprives the non-moving party of its opportunity to address the new arguments." (citing *Cooper v. Shelby Cty.*, No. 07–2283, 2010 WL 3211677, at *3 (W.D. Tenn. Aug. 10, 2010))). As noted above, in their initial filing, Defendants failed to meet their initial summary judgment burden on this claim, inasmuch as they stated their argument in a mere "perfunctory manner." *See Fowler*, 819 F.3d at 309. The Court will not allow Defendants a second chance to meet their initial burden in their reply brief. Accordingly, Defendants' intentional interference with a business relationship claim will proceed to trial.

### 4. Damages

Finally, Defendants contend that Plaintiff has not produced any documents regarding compensatory or emotional damages, and failed to provide any basis for back pay or punitive damages. (Doc. No. 72 at 22). As an initial matter, Defendants have not demonstrated, "by reference to materials on file" that Plaintiff is not entitled to damages, and therefore, have not met

their initial burden at summary judgment to lead the Court to dismiss all of Plaintiff's claims on this basis. *See Clark*, 929 F.2d at 608. Instead, Defendants once again skip over their initial burden and argue as if Plaintiff bears the burden to show some evidence—which Plaintiff does not, precisely because Defendants did not shift the burden to Plaintiff by meeting their initial burden

Alternatively, even if Plaintiff did bear the burden incorrectly attributed to him by Defendants, Plaintiff would have satisfied that burden. The Court concludes that there is sufficient evidence in the record of Plaintiff's damages to withstand summary judgment. Plaintiff testified about his attempt to obtain other employment after his termination from Vanderbilt, and his salary amounts after his termination. Keeping in mind that reasonable inferences are to be drawn in favor of Plaintiff, the non-movant, the Court finds that although Plaintiff's evidence of damages is not strong, he has produced evidence of damages to survive summary judgment, and the question of whether he is entitled to these damages should be reserved for the jury. Plaintiff's uncertainty at deposition as to the total amount of their damages will not lead to a dismissal of his claims. *See Roe v. Debt Reduction Servs., Inc.*, No. CV-05-0330-FVS, 2007 WL 1266151, at *7 (E.D. Wash. Apr. 30, 2007) ("[T]he Court believes that dismissal of a plaintiff's claims for lack of specificity regarding damages is inappropriate at summary judgment."). The amount of damages (if any) suffered by Plaintiff, as well as whether he is entitled to those damages, is a matter reserved for trial.

## CONCLUSION

In their motion for summary judgment, Defendants in multiple places have: (1) relied on arguments better suited for the jury at trial than for the Court on this motion for summary judgment, at which stage genuine material factual issues still abound; and (2) relied on Plaintiff's alleged failure to proffer evidence on an issue when in fact Plaintiff was not required to do so, because

Defendants never met their initial burden so as to impose on Plaintiff the burden to come forward with evidence on the issue. Primarily for these reasons, as set forth in detail above, Defendants' Renewed Motion to Dismiss and Motion for Summary Judgment (Doc. No. 70) will be **DENIED**. Plaintiff's claims will proceed to trial.

An appropriate order will be entered.

*Eli Richardson*
ELI RICHARDSON
UNITED STATES DISTRICT JUDGE